## THE SAEHELM.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1900.)

### No. 870.

PILOTAGE—UNNAVIGABLE VESSEL—STATUTES.

A helpless and unnavigable vessel, which has sprung a leak, so as to require the use of two steam pumps, and is without master, commander, or crew, having but a dozen laborers aboard, working the pumps, and has only a temporary rudder, and is in tow of a steam tug, is not within Pol. Code Ga. 1895, § 1656, providing that "any person, master, or commander" of a vessel "bearing towards any of the ports, rivers, or harbors of this state" shall be liable to pay the first pilot offering his services, and exhibiting his license, "if demanded by the master," though section 1664 requires the pilot to offer his services to a "vessel in distress," these sections, with section 1657, securing to the pilot bringing the vessel in the right to take her out "unless the master of such vessel shall prove * * * that such pilot misbehaved while in charge of the vessel"; section 1658 providing that the pilot shall moor or dock the vessel, if required by the master on arrival, and section 1666 providing that "the master of a vessel in readiness to leave must, if practicable, give notice to the pilot entitled to conduct the vessel out" showing that a navigable vessel with a master on board, and not one in need of salvage service, is contemplated.

Appeal from the District Court of the United States for the Southern District of Georgia.

Joseph A. Cronk (Gignilliat & Stubbs, on the brief), for appellant.
T. P. Ravenel (Lester & Ravenel, on the brief), for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. This is a case of pilotage in which a decree was rendered in favor of the libelant. The claimant appeals to this court, and the decree is assigned as error. The material facts may be briefly stated. In 1898 the Norwegian bark Saehelm, while navigating the harbor of Sapelo, Ga., lost her rudder, sprung a leak, and became water-logged. She went aground there "on the mud bank." In this condition she was disposed of at public sale, with her cargo, and James Foley became the purchaser of both. Foley contracted with the Propeller Towboat Company to deliver the bark and cargo at Savannah, Ga. A temporary rudder was put up, and two steam pumps were used to clear her of water. But the pumps would not keep her clear of water. To run the pumps, Foley put "a dozen negroes and a watchman in charge." Only one of the men was a seaman, and he was employed as a laborer. No man on board had a captain's or a master's license. She was towed out, with her cargo aboard, from Sapelo, by a tug. The tug "had United States license," and her captain in charge was authorized to navigate her without paying pilotage. When she was about two miles outside of Tybee bar, John H. Craig, the libelant, approached her on the J. H. Estill. She was then in tow of one steam tugboat. Craig offered his services as pilot, and was not accepted. The Saehelm continued in tow of the tug till she was over halfway between the bar and Tybee Lighthouse, and then the tugboat Cynthia went to her assistance, and took hold of her. At the time Craig spoke her, she was drawing 22 feet

of water. After she got to the lighthouse, they stopped pumping, and she went to her decks, 25 feet. The Saehelm was not entered or cleared from the custom house at Savannah. The deputy collector testified that: "The vessel was a wreck. She was coming in to be repaired. Under these circumstances, not required to enter or clear." The amount of pilotage fixed by the regulations for a vessel drawing 22 feet is $160, and the decree was rendered in favor of the libelant for that sum.

This case turns on the proper construction of the statutes of Georgia relating to pilots and pilotage. The statutes are contained in sections 1656–1658, 1664, and 1666 of the Political Code of Georgia of 1895, which, for convenience, are printed in full in the foot-note.[1] The purpose of the statutes is to require a ship or vessel, with certain named exceptions, bearing towards any of the ports of the state, to accept the services of a pilot, and to require that the first pilot who offers his services shall be paid, whether his services are accepted or not. The question in this case is whether or not the Saehelm, when the libelant offered his services, was in a condition to make her subject to these statutes. The ship or vessel must be one "bearing towards a river or harbor of this state." Section 1656. The first lines of this section refer to "any person, master, or commander," etc., who refuses to receive a pilot; but the last lines provide that the pilot shall exhibit his license, "if demanded by the master." The following section (1657) is to secure to the pilot who brought the vessel in the right to take her out, "unless the master of such vessel shall prove to the satisfaction of the commissioners that such pilot misbehaved while in charge of the vessel." Section 1658 provides that the pilot shall moor or dock the vessel if required by the master on arrival. Section 1666 provides that "the master of a vessel in readiness to leave must, if practicable, give notice to the pilot entitled to conduct the vessel out." Clearly, these four sections refer to a navigating vessel, bearing towards a port or harbor, with a master on board. There are words in each of the four sections to indicate that the legislature meant a vessel or ship with a master aboard. In the first section the master may demand the exhibition of the pilot's license; in the second, he may make proof of the pilot's misconduct; in the third, he may require the pilot to moor or dock the vessel; and, in the fourth, he must give notice of readiness to leave. A ship or vessel with a master, or with some person in command, was meant. This view was taken by libelant's proctors when the libel was filed, for we find it alleged in the libel that "libelant tendered his services to the master thereof, or person in command thereof." The language of the act shows indisputably that a vessel with a master is meant, or, at least, with some person in command. It is, we think, implied that a crew would be aboard to manage or control the vessel. This leads to the conclusion that a vessel that is navigable, and with master and crew in charge, is meant. When the libelant offered his services as pilot, the Saehelm, though she had a cargo aboard, had only a temporary rudder, had sprung a leak so as to require the use of two steam

[1] See note at end of case.

pumps, was without master, commander, or crew, having but a dozen laborers aboard, and was in tow of a steam tug. To quote the evidence of Capt. Avery, an experienced sailor, "She was more a raft of timber than a navigable vessel."

In Hobart v. Drogan, 10 Pet. 117, 123, 9 L. Ed. 366, 368, Mr. Justice Story, after defining a pilot as "a person taken on board at a particular place for the purpose of conducting a ship through a river, road, or channel, or from or into a port," said:

"His duty, therefore, is properly the duty to navigate the ship over and through his pilotage limits, or, as it is commonly called, his 'pilotage ground.' The case, therefore, necessarily presupposes that the ship is in a condition capable of being navigated; distressed, if you please, and laboring under difficulties, but still capable, in point of crew, equipments, and situation, of being navigated."

The case of Flanders v. Tripp, 2 Low. 15, Fed. Cas. No. 4,854, decided by Judge Lowell, is in point. The ship in that case was not fit to be navigated, and the master was on shore, seeking a tugboat. The libelant was the first pilot to offer his services, which were declined. The Massachusetts statute (St. 1862, c. 176, sched. 5), like the Georgia statute, gave a fee to the first pilot offering his services. The court decided against the libelant, holding, in effect, that there is in the statute an implied exception in the case of vessels which cannot be navigated by the pilot without further assistance in the nature of salvage or quasi salvage service. The point of the decision is that a vessel which stands in need of salvage service is not required by the statute to accept the offer of pilotage. It is true, as pointed out by the learned proctors for the libelant in the present case, that Judge Lowell observed that he found nothing in the statute law of Massachusetts that required pilots to assist vessels in distress. He said, therefore, that the general rule holds good that they are not required to be salvors without salvage compensation. There is nothing in the Georgia statutes which makes this case inapplicable. Section 1664 requires the pilot to offer his services to a "vessel in distress," but, construing that section in connection with the other sections cited, we do not think it includes an unnavigable vessel. The language is used by the legislature in its ordinary meaning. A vessel is in distress when in a state of danger or necessity, "as from want of provisions or water," etc. (Webst. Dict.); or "in a situation of misfortune or calamity, as a steamer in distress" (Stand. Dict.). A vessel, of course, is also in distress when wrecked, and needing salvage service; but this section must be construed in connection with the others on the same subject. The legislature, looking at all these statutes, did not mean to force pilotage on a vessel needing only salvage. To come within the meaning of the statutes, the vessel must be navigable, and then, if in distress, the pilot is required to first offer his services to the vessel so in distress. An unnavigable derelict, for illustration, in charge of salvors, cannot be within the meaning of these statutes. If the vessel is so damaged or so situated as to need salvage services, and not pilotage, the statute does not prevent the pilot, whose services are not accepted or rendered as

such, from becoming a salvor, and receiving salvage compensation. It should not be presumed from the language of the statute that the legislature intended to impose on pilots the often more onerous and dangerous duties of salvors, and allow them only the less remunerative compensation of pilots. The conclusion of Judge Lowell, therefore, becomes pertinent to this case:

"I am of opinion that the rule is reciprocal, and that, as a pilot is not bound to take upon himself the duty of a salvor of a disabled vessel, without the advantages of that position, so a ship which stands in need of a salvage service is not bound to accept the offer of pilotage, if her need is for something more, which the pilot cannot supply."

The Saehelm was in tow, receiving service in the nature of salvage, when hailed by the libelant. She was not propelled by her own power. Alone, she was helpless and unnavigable. "These acts of pilotage," as was remarked by Blandford, J., in Wright v. Lake, 75 Ga. 220, "are founded on public necessity for the security of commerce and the protection of life." The policy and purpose of the statutes would not be promoted by forcing vessels in charge of salvors to accept unnecessary pilots, and by refusing salvage compensation to pilots for salvage services. We hold that a vessel, without master or crew, and without the power to navigate on account of damage sustained, and in tow of a steam tug into port, is not required, by the statutes of Georgia, to accept the services of a pilot, and is not made subject to his fees on refusal to accept his services. The decree of the district court is reversed, and the cause remanded, with instructions to dismiss the libel.

### NOTE.

Political Code of Georgia of 1895:

"Sec. 1656. Any person, master or commander of a ship or vessel, except vessels exempt by United States laws and vessels while licensed under the provisions of this article and vessels of less than one hundred tons burden, bearing towards any of the ports, rivers, or harbors of this state, and who refuse to receive a pilot on board, shall be liable, on his arrival in such port, river, or harbor in this state, to pay the first pilot who may have offered his services outside the bar, and exhibited his license as a pilot if demanded by the master, the full rates of pilotage, inward and outward, established by law for such vessel.

"Sec. 1657. The pilot who brings in a vessel into port, or one attached to his pilot-boat, shall have the exclusive right to take her out, unless the master of such vessel shall prove to the satisfaction of the commissioners that such pilot misbehaved himself while in charge of the vessel or was in the meantime deprived of his license, or that such pilot had obtained the inward pilotage against the right of some other pilot first offering his services, and in any of these cases another pilot shall be employed, and in that event the outward pilotage fees shall belong to the pilot who takes her out.

"Sec. 1658. Every pilot in any of the ports, rivers, or harbors aforesaid, bringing any vessel to anchor in any of said ports, rivers, or harbors, shall moor such vessel, or give proper directions for the mooring of the same and the safe-riding thereof, or shall dock such vessel if required by the master on arrival, and said pilot shall not be entitled to compensation in addition to his pilotage for so doing."

"Sec. 1664. Every pilot-boat cruising, or standing out to sea, must offer the services of a pilot to the vessel nearest the bar, unless a vessel more distant be in distress, under penalty of fifty dollars for each and every neglect or refusal, either to approach the nearest vessel, or to aid her if required, or to

aid any vessel in sight showing signals of distress; and the commissioners, or a majority of them, may, for such neglect or refusal, deprive the pilot of his license."

"Sec. 1666. The master of a vessel in readiness to leave must, if practicable, give notice to the pilot entitled to conduct the vessel out, of his intention to leave, or to some other pilot belonging to the same boat: provided, such pilot be at the place of departure of such vessel or near thereto."